IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| UNITED STATES OF AMERICA, | ) | Criminal No.: 3:18-cr-201-MOC |
|---|---|---|
| v. | ) | |
| CAMERON JAMOND HALLMAN | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SENTENCE REDUCTION**

Defendant Cameron Jamond Hallman moved the Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release, relying on the threat posed by the COVID-19 pandemic. The United States respectfully opposes the motion. While Defendant suffers from type II diabetes mellitus, a medical condition that the CDC recognizes to be a risk factor for severe illness from COVID-19, Defendant cannot establish that he does not pose a danger to the community or that the § 3553(a) factors weigh in favor of release. Accordingly, Defendant's motion should be denied.

## FACTUAL BACKGROUND

**I.    Defendant's Conviction and Request for a Sentence Reduction**

On July 24, 2018, Defendant pleaded guilty to one count of Hobbs Act conspiracy, in violation of 18 U.S.C. § 1951(a); two counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); and one count of brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c). According to the Factual Basis, Defendant and his cousin committed armed robberies of two fast food restaurants on the morning of April 11, 2018. At the time of the robberies, Defendant was on supervised release from a prior Hobbs Act robbery conviction in this district in 2012, for which he was sentenced to 114 months of imprisonment and was released on December 15, 2017.

1

On July 8, 2019, Defendant was sentenced to 180 months of imprisonment, significantly below the applicable 357- to 371-month guideline range, pursuant to a departure. (*See* Docs. 21, 24.) Defendant also benefited from the plea agreement's dismissal of the second count of brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c), which would have subjected him to an additional mandatory 25-year sentence.

Defendant has served approximately 32 months (18%) of his sentence. (*Id.*) His current projected good time release date is February 9, 2031, and his full term release date is April 28, 2033. (*Id.*)

Defendant is 28 years old and suffers from hypertension and type II diabetes mellitus. FCI Williamsburg, where Defendant is incarcerated, currently has 38 active inmate COVID-19 cases and 8 active staff COVID-19 cases. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/.

On or about October 25, 2020, Defendant submitted an informal compassionate release request to the warden of his facility based on concerns about COVID-19. The request was denied on November 20, 2020.

On December 14, 2020, Defendant filed a motion with this Court seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A) on the ground that he is at high risk of developing serious illness from COVID-19 due to his health conditions. According to Defendant's BOP case manager, BOP has not considered Defendant as a candidate for home confinement.

## II. BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive

disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to

stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, such as Philadelphia, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).

Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the

authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has transferred 20,053 inmates to home confinement. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

**LEGAL FRAMEWORK**

A court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and

compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[1]

---

[1] In *United States v. McCoy*, — F.3d —, 2020 WL 7050097 (4th Cir. Dec. 2, 2020), the Fourth Circuit held that the policy statement found in U.S.S.G. § 1B1.13 does not apply to compassionate release motions brought by inmates under 18 U.S.C. § 3582(c)(1)(A)(i). *Id.* at *6–9. According to *McCoy*, because § 1B1.13 specifics its applicability only to motions brought by the Bureau of Prisons, it cannot be the policy statement applicable in circumstances where defendants bring their own motions for compassionate release. *Id.* In place of the no-longer-applicable policy statement, *McCoy* permits "courts [to] make their own independent determinations of what constitutes an 'extraordinary and compelling reason[ ]' under § 3582(c)(1)(A), as consistent with the statutory language[.]" *Id.* at *9.

*McCoy* noted, however, that § 1B1.13 "remains helpful guidance even when motions are filed by defendants." *Id.* at *7 n.7. In stating as such, *McCoy* approvingly cited the Seventh Circuit's recent decision in *United States v. Gunn*, — F.3d —, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020), which similarly held that there currently exists no applicable policy statement for compassionate release motions brought by inmates. Nonetheless, the Seventh Circuit explained that § 1B1.13 remains useful in framing a court's inquiry as to what constitutes "extraordinary and compelling reasons." As it stated, "[t]he statute itself sets the standard: only "extraordinary and compelling reasons" justify the release of a prisoner who is outside the scope of § 3582(c)(1)(A)(ii). The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused. In this way the Commission's analysis can guide discretion without being conclusive." *Id.* (citing *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007)). Thus, although *McCoy* broadened district courts' discretion under

7

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(B)-(C). In particular, a defendant's age may constitute an extraordinary or compelling reason if the defendant is 65 years old; "is experiencing a serious deterioration in physical or mental health because of the aging process"; and has served at least ten years or 75% of his term of imprisonment, whichever is less. *Id.* Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

## ARGUMENT

Defendant's motion for a reduction of his sentence should be denied. While Defendant suffers from type II diabetes, which the CDC recognizes to be a COVID-19 risk factor, Defendant still poses a danger to the community and the statutory sentencing factors weigh against his release.

---

§ 3582(c)(1)(A), it nonetheless appeared to envision a system whereby courts remain confined within a traditional discretionary framework.

**I.      Defendant Suffers From a Qualifying Medical Condition.**

Under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

Defendant suffers from type II diabetes, which the CDC recognizes as one of the medical conditions that renders a person at a higher risk of severe illness from COVID-19.[2] (*See* Medical Records, attached as Exhibit A, at p. 22.) It is noteworthy that Defendant's diabetes has been well-managed while in prison; Defendant's medical records state that he has had "admirable control" over his diabetes. (*Id.*) Through his medical, diet, and exercise plan, he has lowered his

---

[2] *See* Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19), People with Certain Medical Conditions*, at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fpeople-at-higher-risk.html.

hemoglobin A1c to nearly pre-diabetic levels. (*Id.* at pp. 2, 21-22.) Regardless, the Government concedes that, under current circumstances, Defendant suffers from a qualifying medical condition under the application note and *McCoy*.

## II. Defendant Still Poses a Significant Danger to the Safety of the Community and the § 3553(A) Factors Strongly Weigh Against his Release.

Defendant's request for a sentence reduction should be denied despite his medical condition because he has failed to demonstrate that he is not a danger to the safety of the community or that he otherwise merits release under the § 3553(a) factors.

Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

The evidence before the Court cannot support a finding that Defendant would not pose a danger to the community if released. Quite simply, Defendant committed two armed robberies about four months after being released from a 114-month sentence for committing nine armed robberies. *See United States v. Hallman*, Case No. 3:11-cr-161 (W.D.N.C. 2011). Defendant's criminal history immediately prior to this case demonstrates that his serving less than three years of imprisonment cannot have been sufficient to ensure he will not reoffend.

In addition, the § 3553(a) factors greatly disfavor a sentence reduction. Defendant's current 180-month sentence is significantly below the 357- to 371-month guideline range applicable to his offense level and criminal history. Releasing Defendant after having served just 32 months of this significantly reduced sentence "would make a mockery of the considerations enumerated in 18 U.S.C. 3553(a). It would not come close to reflecting the seriousness of the offense, or providing

just punishment for the offense. Moreover, rather than promoting respect for the law and its deterrent effect, it would undermine it." *United States v. Davies*, No. 17-CR-57, 2020 WL 2307650, at *2 (E.D.N.Y. May 8, 2020) (denying release of defendant who had served about three years on eight-year armed robbery conviction); *see also United States v. Jankee*, No. 3:12-CR-348-MOC-1, 2020 WL 6140448, at *4 (W.D.N.C. Oct. 19, 2020) (denying compassionate release for inmate suffering from obesity and hypertension who had only served 96 months of 180-month sentence; stating, "[r]eleasing Defendant after serving around 62.5% of his statutory term sentence (and only 53.3% of his full term) would result in a sentence that failed to reflect the serious nature of this offense or provide just punishment.").

Courts across the country have routinely denied compassionate release requests from similarly-situated inmates suffering from COVID-19 risk factors for these reasons. *See, e.g.*, *United States v. Soto*, No. 16-CR-00138, 2020 WL 3316003, at *2 (D. Colo. June 18, 2020) (denying compassionate release motion for 70 year old inmate who had committed string of bank robberies out of concern of the defendant's likelihood to reoffend); *United States v. Leon*, No. 15-CR-877, 2020 WL 3100593, at *3 (S.D.N.Y. June 11, 2020) (denying release for 34 year old inmate suffering from asthma who had served 60% of 84-month sentence for string of six robberies as incompatible with public safety and under the § 3553(a) factors); *United States v. Iezzi*, No. 2:17-CR-00157, 2020 WL 4726582, at *9 (W.D. Pa. Aug. 14, 2020) (denying compassionate release for inmate suffering from chronic kidney disease who had served only 40 months of 120-month term for his third bank robbery conviction, and who suffered from the same conditions at the time of the crime).

Because Defendant's time served is also well short of the statutory seven-year minimum sentence for brandishing a firearm required by 18 U.S.C. § 924(c), his early release would also fail

to provide just punishment and would result in an unwarranted sentencing disparity compared to similarly situated defendants. "[T]he presence of [a mandatory minimum] sentence is indicative of the seriousness of the offense and ought to be considered when determining whether the goals of punishment and deterrence have been fulfilled. *United States v. Goodall*, No. 13-cr-0668, 2020 WL 4262277, at *4 (D. Md. July 24, 2020) (denying compassionate release for inmate suffering from COVID-19 risk factors who had not yet served ten years of 156-month sentence on drug conviction).

Accordingly, in light of Defendant's record and the totality of relevant circumstances, this Court should deny the motion for a sentence reduction.

## **CONCLUSION**

For the foregoing reasons, this Court should deny Defendant's motion for a sentence reduction.

Respectfully submitted,

R. ANDREW MURRAY
UNITED STATES ATTORNEY

/s Graham R. Billings
Graham R. Billings
Assistant United States Attorney
NC Bar No. 55972
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 338-3137
Facsimile: (704) 344-6629
E-mail: graham.billings@usdoj.gov

*Attorney for the United States of America*

# CERTIFICATE OF SERVICE

I certify on January 12, 2021, that a copy of the foregoing **GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SENTENCE REDUCTION** will be served upon Defendant by causing to be placed said copy in a postpaid envelope addressed to the person(s) hereinafter named, and by depositing said envelope and contents in the United States Mail at United States Attorney's Office, Charlotte, North Carolina:

> Cameron Jamond Hallman
> Reg. No. 26547-058
> FCI Williamsburg
> Federal Correctional Institution
> P.O. Box 340
> Salters, SC  29590

s/ Graham R. Billings